## LOCKWOOD *v.* DANIEL.

No. 14243. SEPTEMBER 18, 1942.

*George S. Cargill,* for plaintiff. *Ernest J. Haar,* for defendant.

GRICE, Justice. On a former trial a nonsuit was granted. That ruling was reversed by this court, in the report of which may be found a statement of the pleadings. *Lockwood* v. *Daniel,* 193 *Ga.* 122 (17 S. E. 2d, 542). On the trial now under review, after the parties had offered testimony, the jury returned a verdict in favor of the defendant. A motion for new trial was overruled, and the plaintiff assigns error on that ruling.

The plaintiff submitted evidence which supported every material allegation in her petition. The effect of the decision on the former appearance was that if the facts were as stated, the plaintiff would be entitled to have her case passed on by a jury. In reaching that conclusion, which was based on a number of authorities cited, several propositions of law were laid down. Applying those to issues made by the pleadings, and to the evidence as a whole as it appears in the present record, the plaintiff was entitled to a verdict. The contentions to the contrary, insisted on by counsel for the defendant, rest on two hypotheses. The first is, that the prescriptive title urged by the plaintiff originated in bad faith; for that after the fence was rebuilt in the year 1917, under an agreement between Cargill and Harkness, then coterminous proprietors under whom the plaintiff and defendant respectively claim, each to pay one half of the expense, Cargill in the year 1919 had a survey made which disclosed that this new fence encroached on the prop-

erty of Mrs. Harkness, and yet he did not so advise Mrs. Harkness. In both deeds the property was described as so many feet, more or less. Cargill testified as follows: "I bought this lot in 1917. I replaced the fence in 1917. This map made in 1919, two years after that, as to whether it shows the fence was not on the property line: It shows the fence 3.2 feet on the front and 2.26 at the back. I did not say that in 1919, as soon as I found this out, I told Mrs. Harkness the fence was in the wrong place. As to whether I did anything, why should I?" Q. "If the fence stayed in the same place for twenty years, you wanted to claim title by prescription?" A. "I had a deed to thirty feet, more or less; and if Mrs. Harkness was satisfied, why should I complain? I think I looked up the title to this property. I know it called for thirty feet. I returned it for taxation as lot 84. I never said lot 84 and part of lot 86." Q. "Anyhow, in the practice of law, where the deed calls for thirty feet more or less, the words 'more or less' mean a reasonable difference; you would not say three feet in a thirty foot lot would be a slight variation?" A. "That is up to the jury. I think it may be so interpreted. It is so held by the Supreme Court."

The statement that possession to be the foundation of a prescription must not have originated in fraud can not well be denied. Code, § 85-402. It is in evidence, without dispute, that when the witness originally purchased the property there was an old fence, and that the new fence was rebuilt on the same line. It was afterwards that he had the survey made. When it was made, and it showed that under his deed which called for thirty feet more or less, he was in possession of a strip which at the front measured three and two-tenths feet more, and at the back two feet and twenty-six hundredths more, his not saying anything to Mrs. Harkness about this did not prove that his possession originated in fraud. No duty rested upon him to impart that knowledge to her, and his withholding it from her did not affect the character of his possession.

Secondly, it is said that there was testimony which contradicted that offered by the plaintiff, and from which the jury could have found that the new fence recently placed there by the defendant, and of which the plaintiff in her petition complains, was on the line of the former fence. We are referred to certain excerpts from

the testimony of Walter Zoller, a witness for the plaintiff, and McKenzie. That of Zoller, relied on and set forth in the brief of counsel for the defendant, is as follows: Q. "Will you state whether or not Mrs. Lockwood has considerable property to the rear of her lot as a result of the fence being straightened up?" A. "Yes, sir, the fence seems further to the other side." Q. "Further over to Mrs. Daniel's side?" A. "Yes, sir." Q. "And therefore Mrs. Lockwood has gained quite a bit of ground in fact?" A. "I would say two or three feet."

The foregoing extract from the testimony of the witness Zoller was immediately preceded by this statement: "I observed the rear or southern end of this fence after the new fence was put up." From the quoted extract alone it does not appear what fence he had in mind. He had already testified, that he had observed both the new and the old fence; that he had lived on both lots; that he moved to this lot in 1913 and lived there thirteen years; that when he first went there, there was a board fence that extended from the front of the lots to the rear. He further testified: "I remember the occasion, about 1917, when the old fence was replaced by you [Cargill]. It was replaced panel by panel. It was built on the line of the old fence. If there was any change made in the line at that time, it was no more than six inches."

The testimony of the witness should be harmonized, if possible. In view of the positive statement next above quoted, this court will not construe the word "fence," in that part of the testimony first quoted, to refer to the fence recently placed there by Mrs. Daniel. Neither in the pleadings filed by her nor from the testimony of any of the witnesses introduced by her is it claimed that the fence erected by her was further over on Mrs. Daniel's property than the old fence. Mrs. Daniel did not go on the witness stand, but her husband, Thomas S. Daniel, did. He testified, that he hired Mc-Kenzie to put up the new fence; that before he did anything about putting up the fence he had a survey made; that he wanted to be sure he was putting the fence in the right place; that the fence was built from stakes placed at four points; that there was a fence between Mrs. Lockwood's property and his when he bought it. "I saw it, but did not understand that was a division line; my possession extended to the fence and no further. I made no change in the line of the fence until in June, 1940. I bought the property in

1930." Before the witness Daniel left the stand, in answer to questions by the judge he said: "That is right. Before I fixed the fence I got an engineer to point out my line. On the front of that fence I recovered eighteen inches. I set it about eighteen inches from where the old post was. I ran a straight line to the back. Back there, that was patched over. There used to be an old stable in the corner against this fence, and that fence had evidently pushed the fence over on his property in the back. The fence was cater-cornered across the property. When I put the new fence in the back, as to which side of the fence I did put it: I built that on my line. How many inches? I imagine about eighteen or twenty inches; about the same thing. As to what I would say as to the back of the old fence as it stood and the new as it now stands: I figured on a square foot basis it would be about equal as it is now. It takes away from the front and gives in the back; about the same square feet as before, but the line has been straightened out."

The witness McKenzie testified: "Mr. Daniel requested me to build a fence for him. I built the fence between the Lockwood and Daniel property. The old fence did not run perpendicularly at all. It ran at random. In other words, it would come over the line and go out. That was all the way down the length of the fence, practically. The fence has been placed substantially on the old line, with the exception of straightening it up. In other words, the fence is now in the same place, substantially, as the old fence, with this exception, that it is straight now, and it was not before. . . In putting down this new fence, when I was digging closest to Maupas Avenue, I ran into old posts, rotten in the ground. That is where I put the new posts. . . As a matter of fact, I had been using the driveway up to the time the fence was changed. After the fence was changed I could not use it. I could just get a small car in there, but I could not drive through there. I could not before, without busting into the fence. On account of the fence leaning? From the way the fence was built, crooked." Q. "You mean the fence originally was built like a snake?" A. "I was able to drive an automobile in there before the fence was changed." Q. (Reading from witness's testimony on former trial): "Did you not tell Mr. Harkness a year ago, when this case first came up, that this fence was moved about two and half

feet from the line of the old fence?" A. "I don't remember now exactly what I told him." Q. "Is that correct?" A. "It has been so long I can not recollect that." Q. "But that is a fact, that it was moved about two and a half feet?" A. "No, after it was straightened it may have taken that much in the front, but it gave it to you in the back." Q. "Is that your testimony? A. "Yes, sir, that is correct."

Taking this testimony in its entirety, it can not be said that he placed the new fence on substantially the same line as the old one. Viewing the entire testimony, there was no conflict in any material respect. The suit was filed on June 30, 1941. There was no complaint about the old fence until about two years before the suit was filed, and no attempt until then to change the fence. Shortly after January 17, 1917, the two owners of the adjacent lots agreed that a new fence should be built to take the place of the old one already there separating the two properties. A new fence was accordingly constructed, the expense of such replacement being borne equally between the two owners. Each one's possession up to the fence was recognized. A driveway was laid out on each side of the fence, and each was used continually. Mrs. Harkness, Mrs. Daniel's predecessor in title, would from time to time repair the fence. The defendant threatened to block the driveway. Under the evidence introduced, this was an invasion of the right of the plaintiff, and she was entitled to a verdict.

This court is always reluctant, as it should be, to render a decision the effect of which is to set aside a verdict of a jury that has met with the approval of the trial judge. As has so often been ruled, if there be any evidence to support the verdict, however slight it may be, the power to interfere with such finding is lacking. Whether or not there is any evidence that would support the finding is a question of law; and when a trial judge approves a verdict without evidence to support it, an error of law is committed. Such a case is presented by the record before us. An analysis of the proofs submitted demonstrates this conclusion. Since a new trial should have been granted on the general grounds, no rulings need be made on the special grounds of the motion.

*Judgment reversed. All the Justices concur.*