S12A0888. PATTERSON-FOWLKES v. CHANCEY.
(732 SE2d 252)

HINES, Justice.

This is an appeal by caveator Lisa Patterson-Fowlkes ("Patterson-Fowlkes") from the superior court's denial of her motion for judgment notwithstanding the verdict, or in the alternative, motion for a new trial, following the entry of a final judgment on a jury verdict which upheld the last will and testament of her grandmother, Ruth Chancey Wright ("Wright"). The sole challenge on appeal is that Wright lacked the capacity necessary to execute the will. For the reasons that follow, we affirm.

Wright executed her will on November 1, 2005, when she was 90 years old. She died three years later on December 16, 2008. Wright's grandson and Patterson-Fowlkes's brother, Bobby Chancey ("Chancey") petitioned to probate his grandmother's will. Shortly after, Patterson-Fowlkes filed a caveat alleging that Wright did not possess testamentary capacity at the time she executed her 2005 will. The probate court denied the caveat and upheld the will. Patterson-Fowlkes appealed to the superior court, and the case was tried before a jury,

---

which rendered a verdict upholding the will.[1] The superior court entered a final judgment in accordance with the jury's verdict. Patterson-Fowlkes moved for judgment notwithstanding the verdict, or in the alternative, for a new trial, and the superior court denied the motion.

In its review of the denial of a motion for judgment notwithstanding the verdict, this Court is to determine whether there is any evidence to support the jury's verdict. *Georgia Power Co. v. Irvin*, 267 Ga. 760, 762 (1) (482 SE2d 362) (1997). This same standard of appellate review is to be applied in the situation of the denial of a motion for a directed verdict or a motion for new trial on general grounds. Id. In so doing, this Court must construe the evidence in a light most favorable to the prevailing party in the court below. Id.

As to Patterson-Fowlkes's substantive challenge of lack of testamentary capacity, it must be noted that a testatrix possesses the capacity to make a will if, at the time of executing it, she understands that a will is intended to dispose of her property after her death, is capable of remembering generally what property and persons related to her are subject to the will's disposition, and is capable of setting forth an intelligent scheme to dispose of her property. *Strong v. Holden*, 287 Ga. 482, 483 (1) (697 SE2d 189) (2010). Evidence of the testatrix's condition both before and after execution of the will is admissible to demonstrate testamentary capacity. Id. The mental capacity to make a will is modest, and the law requires only that the testatrix have a "decided and rational desire as to the disposition of [her] property." *Wilson v. Lane*, 279 Ga. 492 (614 SE2d 88) (2005); OCGA § 53-4-11 (a). Indeed, testamentary capacity may be possessed by weak-minded or feeble individuals. Id. at 492. And "anything less than a total absence of mind does not destroy [testamentary] capacity." *Griffin v. Barrett*, 183 Ga. 152, 164 (187 SE 828) (1936).

In this case, the execution of Wright's will was videotaped. Patterson-Fowlkes contends that Wright was unable to answer simple questions such as recalling her family members and identifying the property subject to the will. However, the videotape reveals that when asked, Wright immediately named her sister, brother, and sister's children. She further identified her two grandchildren to whom her property was bequeathed and even her great-grandchildren. Even accepting Patterson-Fowlkes's averment that Wright incorrectly stated the ages of her great-grandchildren by two, three, and

---

[1] In addition to upholding the validity of the will, the jury's verdict expressly found valid two 2005 powers of attorney executed by Wright in favor of Chancey and a 2005 transfer of $250,000 into three certificates of deposit in the names of Wright and Chancey.

six years, this can hardly be considered as Wright not "remembering generally" the persons related to her. *Strong v. Holden*, supra at 483 (1). When asked how much property she owned, Wright first responded "quite a bit," and when pressed, she claimed she owned 200 acres. It appears that she lived on 6.92 acres, but the adjacent family farm is over 60 acres, which one witness described as "a lot of land." Wright also mistakenly claimed that she owned two separate 100-acre tracts that she purchased for Patterson-Fowlkes and Chancey. While this was inaccurate, when asked what she wanted to do with her land, Wright answered that four rental houses she owned were to go to Patterson-Fowlkes and the remaining property to Chancey. Notably, the attorney who assisted Wright with her will testified that Wright requested the same disposition of her property twice in an initial meeting between the two and a private meeting before the execution of the will. Patterson-Fowlkes urges that Wright did not understand her own rental properties because there were discrepancies between what Wright stated and what was actually owned. But, any such discrepancies fall far short of demonstrating that Wright did not possess a decided and rational desire as to the disposition of her property. OCGA § 53-4-11 (a); *Wilson v. Lane*, supra at 492. Further, both subscribing witnesses testified that Wright was competent at the time, freely executed her will, and fully understood the ramifications of the will's provisions. See *Prine v. Blanton*, 290 Ga. 307, 308 (1) (720 SE2d 600) (2012) (The propounder can establish a prima facie showing of testamentary capacity by offering testimony of subscribing witnesses that the testator appeared to be of sound mind and acted freely and voluntarily when executing the will.).

Equally unavailing is Patterson-Fowlkes's assertion that Wright did not possess testamentary capacity in the months leading up to and after the execution of her November 1, 2005 will. Viewing the evidence in the light most favorable to Chancey, the prevailing party at trial, it showed the following. Throughout her life, Wright was known as an independent woman who handled her own affairs. She owned several bank accounts and extensive real and personal property. By 2004, Wright's physical health had declined somewhat and in February of that year she was diagnosed with mild dementia and prescribed medication to slow the disease. Throughout 2004, however, she continued managing her family farm, collected rent, and negotiated leases for her rental properties. She re-wrote a previous will in June 2004, and her testamentary capacity was not challenged at the time. On December 26, 2004, Wright was hospitalized due to family members' concern that she was lethargic and not eating or drinking. Physicians diagnosed her with a bladder infection that caused dehydration, and while in the hospital, Wright experienced

some temporary delirium and disorientation at night. After minor treatment, she was released on December 31, 2004 and returned home free of any side effects. Furthermore, numerous witnesses testified that Wright was competent and coherent throughout 2005 including bankers who managed her assets, the probate judge who spoke extensively with Wright when she filed her November 1, 2005 will, and a notary public who witnessed Wright's execution of the power of attorney in favor of Chancey in November 2005.

Following this brief period in the hospital, Wright and Patterson-Fowlkes's relationship became strained, and on April 19, 2005, Patterson-Fowlkes filed a guardianship petition in the probate court seeking to become Wright's full-time guardian. Patterson-Fowlkes did not mention this petition to Chancey or Wright before it was filed. According to multiple witnesses, the guardianship petition greatly upset Wright. Yet, Patterson-Fowlkes asserts that there is no evidence which suggests that Wright was angry with her over the guardianship proceedings, which she maintains leaves no legitimate reason for Wright to have so unequally devised her property, i.e., leaving most of her property to Chancey. However, even assuming arguendo that there was no evidence suggesting a rift between Wright and Patterson-Fowlkes due to the attempt at forced guardianship, there was evidence raising other possible motivation for Wright's favoring of Chancey in the ultimate property distribution. Chancey resided near Wright and assumed the primary responsibility for managing and operating Wright's family farm following the 2003 death of his father, who was Wright's son. In contrast, Patterson-Fowlkes became a physician, engaging in a medical practice in Athens, and ostensibly had significant other assets. Even if there was no evidence upon which to base a readily explainable rationale for Wright's final property distribution, the law does not withhold testamentary capacity merely because a testator is capricious. *Wilson v. Lane,* supra at 492; *Hill v. Deal,* 185 Ga. 42, 46 (193 SE 858) (1937).

In this case, the evidence was sufficient to authorize the jury to find that Wright possessed the capacity to execute the will in question. Significantly, the jury viewed the videotape of the will's execution, which is a linchpin of Patterson-Fowlkes's challenge. This Court's role is merely to determine whether there was "any evidence" to sustain the jury's verdict. And, unquestionably there was. *Georgia Power Co. v. Irvin,* supra at 762 (1).

*Judgment affirmed. All the Justices concur.*

*Smith & Jenkins, Wilson R. Smith*, for appellant.

*Bodker, Ramsey, Andrews, Winograd & Wildstein, Stephen C. Andrews, Jacob A. Maurer, Hicks, Massey & Gardner, William E. Hicks, Friedman, Dever & Merlin, Lawrence M. Merlin*, for appellee.