302 Ga. 494
FINAL COPY

S17A1305.  MEADOWS v. BEAM et al.

PETERSON, Justice.

This case involves a dispute among the children of Dorothy Rita Beam ("Decedent") concerning the distribution of her estate. Decedent's daughter, Dorothy Marian Meadows ("Marian"), filed a petition to probate Decedent's 2014 will and codicil, and Marian's siblings — John Beam, Jr., Margaret Beam, and Jayne Heggen (collectively, "Caveators") — filed a caveat alleging that Decedent lacked testamentary capacity to execute the will and codicil. After a trial, a jury returned a verdict in favor of Caveators, finding that Decedent lacked testamentary capacity and awarding attorneys' fees to Caveators.[1] Marian appeals and argues, among other things, that the evidence does not support a finding that Decedent lacked testamentary capacity. We agree and we reverse.

---

[1] The jury rejected Caveators' claims the will was invalid due to fraud, duress, or undue influence.  Those claims are not before us on appeal.

1. *Trial evidence viewed in the light most favorable to Caveators.*

On appeal, we view the evidence in the light most favorable to the prevailing party. See Patterson-Fowlkes v. Chancey, 291 Ga. 601, 602 (732 SE2d 252) (2012). Although the focus is on a testator's capacity at the time a will is executed, evidence of a testator's condition before and after the execution of the will may be relevant for this purpose. Id.

Viewed in this manner, the evidence shows that Decedent suffered from many medical problems, including arthritis, congestive heart failure, diabetes, and hypertension. In September 2013, Decedent, then 90 years old, was admitted into a hospital and exhibited confusion and forgetfulness during her hospitalization.

Before her hospitalization, Decedent began to express certain beliefs that Caveators found strange. She said that she had been offered a job with the West Lumber Company, but she had stopped working there many years earlier. Decedent continued to make this assertion through 2014. In August 2013, Decedent also claimed she was offered a job at a Kroger grocery store where she and her husband played bingo, but her husband was dead and bingo was no longer played at the Kroger store.

Following her September 2013 hospitalization and during her short stay at a rehabilitation facility in October 2013, Decedent asked Jayne to do some cleaning at Decedent's house and to donate some of Decedent's belongings to charity. Jayne explained that many items were already marked for donation and she identified additional items of clothing that could be donated. Before Jayne donated clothing that was not already marked, Jayne brought the clothing to Decedent for her approval. Jayne also reorganized her mother's house to make it safer upon Decedent's return from the rehabilitation center, explaining to Decedent where she moved things. Later, Decedent accused Jayne of stealing her clothes and also removing documents from her house without permission.

Decedent also came to believe that her son John stole originals of her certificates of deposit and attempted to withdraw the money. In March 2014, as a result of her belief that John was stealing from her and mismanaging her funds, Decedent revoked John's power of attorney that she executed in 2004, asked him to return several estate documents, and questioned why the hospital asked for Decedent's 2004 will. John testified that he accessed a safe deposit box while Decedent was hospitalized because the hospital requested the executed power of attorney and her living will (which were in the same

3

envelope as her will), and that he did not know where the original certificates were located and never touched them. John asked his mother about the certificates and why she believed he took them, but she could not answer any of his questions.

In March 2014, Decedent told people that H&R Block offered her a job because she did a "good job" preparing her own taxes that year, but her taxes actually had been prepared by a third party. Decedent also believed she broke her ankle by tripping over an extension cord at her church, but her family testified that the incident did not happen and her family doctor had no record of it either. Around this time, Decedent told Jayne that a nurse had visited her house to draw blood in preparation for an upcoming gallbladder surgery and that an ambulance would pick her up for the surgery and bring her back home afterward, but her family doctor had no history of the surgery.

Also in 2014, Decedent began complaining about her sister-in-law, called her names, and blamed her for causing Decedent's medical problems, but Decedent's sister-in-law had been dead for over 15 years. Decedent also asked Jayne to move back home to finish her college degree even though Jayne had obtained her degree about 40 years prior. Beginning in April 2014, Decedent

4

sometimes would become confused in phone conversations with Margaret, asking who she was and confusing her for Jayne even though Margaret had previously identified herself.

Decedent's sister, Norma Aballo, with whom she was very close, stated that when she visited Decedent in November 2013, Decedent was showing signs of confusion and memory failure. Sometime after March 2014, Decedent told Aballo that she was going to sell her house in Georgia and move to North Carolina with Marian because she had no family or friends in Georgia. Decedent also told her daughter Margaret that she had no family in Georgia. Aballo also testified that, around this time, Decedent was not acting rationally and began to accuse Caveators of stealing things from her and began to isolate Caveators, which surprised Aballo because Caveators had been the ones who had done everything for Decedent. Aballo said that Decedent had become a different person because of her behavior, memory loss, and confusion.

In April 2014, Decedent executed a will naming Marian as executor and devising property to her children, except to John, with a majority of her estate going to Marian. In the 2014 will, as amended by a July 2014 codicil, Decedent provided that she would not directly give John any assets since "he is a

successful business man, financially astute, [and] independently wealthy," and instead bequeathed $10,000 to a charity in his honor. Decedent had previously executed a will in 2004 in which she devised her property to her four children in equal shares. Shortly after signing the codicil in July 2014, Decedent died.

Aballo stated that she was shocked to hear about the contents of Decedent's 2014 will.[2] Aballo testified that she believed that Decedent's "mind was going" because she thought Decedent always had intended to divide her property equally among her children on account of the "strife" Decedent and her siblings had experienced during the distribution of their mother's estate, something Decedent told Aballo she "never" wanted her children to experience.

At trial, Caveators introduced the testimony of Dr. Matthew Norman, a board-certified forensic psychiatrist, to the effect that he reviewed Decedent's medical records, various depositions, affidavits from people that knew her, and other material in the case. Based on this review, Dr. Norman opined that Decedent had a "potentially" weakened state of mind, lacked testamentary capacity in that she was operating under a "fixed false belief" that Caveators

---

[2] Aballo also was shocked to discover upon arriving for Decedent's funeral that Decedent's body had been cremated despite the fact that Decedent had "never, ever" discussed her cremation. Decedent's 2014 will expressly provided that she be cremated.

6

were stealing from her, and was unduly influenced into executing the 2014 will and codicil.

2. *The evidence was legally insufficient to sustain the jury's verdict.*

Marian argues that the evidence, even when viewed in Caveators' favor, does not show that Decedent lacked testamentary capacity. We agree.

Generally, our review of a jury's verdict is for any evidence, and we lack the power to interfere with the jury's finding if it is supported by any evidence. See Cook v. Huff, 274 Ga. 186, 186 (552 SE2d 83) (2001). But whether the evidence is legally sufficient to support a jury's finding is a question of law. See Lockwood v. Daniel, 194 Ga. 544, 548 (22 SE2d 85) (1942). And in reviewing this question in the context of a challenge to a will, a stringent standard must be met in order to set aside a will, as this deprives a person of the valuable right to make a will. Holland v. Holland, 277 Ga. 792, 795 (4) (596 SE2d 123) (2004). Thus, there must be some evidence to support the jury's finding that this stringent standard was met.

Under Georgia law, "[t]estamentary capacity exists when the testator has a decided and rational desire as to the disposition of property." OCGA § 53-4-11 (a). A showing of testamentary capacity requires a showing that the testator was

sane or of sound mind. See, e.g., Evans v. Arnold, 52 Ga. 169, 181 (1874) ("[I]f the testator appear[s] to be aware of what he is doing, and acts as sane men do, I am of the opinion that a prima facie case is made out, at least that a verdict for the will would be justified[.]"). We have explained that this requirement is fulfilled with a showing that the testator "understood that the will had the effect of disposing of her property at the time of her death, was capable of remembering generally what property was subject to disposition by will, was capable of remembering those persons related to her, and was capable of expressing an intelligent scheme of disposition." Odom v. Hughes, 293 Ga. 447, 454 (748 SE2d 839) (2013) (citation and punctuation omitted). This is a modest requirement, as "testamentary capacity may be possessed by weak-minded or feeble individuals. And anything less than a total absence of mind does not destroy testamentary capacity." Patterson-Fowlkes, 291 Ga. at 602 (citations and punctuation omitted); see also OCGA § 53-4-11 (d).

A person who is not sane does not have the capacity to make a will, except during a lucid interval. OCGA § 53-4-11 (c). A person who is partially insane, a condition known as monomania, may make a will if the will "is in no way connected with the monomania." Id.; see also Boney v. Boney, 265 Ga. 839, 840

8

(1) (462 SE2d 725) (1995). To set aside a will based on an unsound mind, it must be shown that the testator was insane or, if partially so, that the will was connected with that partial insanity. OCGA § 53-4-11 (c); see also Nodvin v. Arogeti, 277 Ga. 602, 602 (1) (592 SE2d 846) (2004); Powell v. Thigpen, 230 Ga. 760, 760-761 (2) (199 SE2d 251) (1973).

Here, Caveators accepted that Decedent's 2014 will and codicil were "self-proved," as they contained affidavits complying with OCGA § 53-4-24. As a result, Caveators admitted that a presumption existed that the will and codicil were executed with the requisite testamentary formalities, including that they were executed by a person apparently with sufficient mental capacity to do so, and they had a burden to rebut this presumption. See Reeves v. Webb, 297 Ga. 405, 408-409 (774 SE2d 641) (2015); see also Skelton v. Skelton, 251 Ga. 631, 632 (2) (308 SE2d 838) (1983). Caveators failed to introduce evidence from which the jury could have concluded that this burden was carried.

Even viewing the evidence in the light most favorable to the Caveators, there was no evidence that the decedent lacked the ability to form a "decided and rational desire as to the disposition of [her] property." OCGA § 53-4-11 (a). Notably, at trial, Caveators expressly disclaimed that Decedent was insane or

9

suffered from monomania. That is, in addition to accepting the presumption that Decedent had testamentary capacity, the Caveators failed to claim that Decedent was not of sound mind. Instead, they merely argued that she suffered from delusions. Assuming, without deciding, that delusions alone, distinguishable from insanity or monomania, were a basis upon which to establish a lack of testamentary capacity, Caveators' claim nevertheless fails. Our case law is clear that not every delusion deprives one of testamentary capacity; rather, it must be an insane delusion. Boney, 265 Ga. at 840 (1).[3] But Caveators effectively conceded that none of Decedent's delusions were insane ones.[4] Consequently,

---

[3] We have defined an insane delusion as existing
wherever a person conceives something extravagant to exist which has no existence whatever, and [s]he is incapable of being permanently reasoned out of that conception. The subject-matter of the insane delusion must have no foundation in fact, and must spring from a diseased condition of mind.
Boney, 265 Ga. at 840 (citations and punctuation omitted).

[4] Indeed, the evidence does not establish that Decedent's will was affected by any insane delusions. Decedent's false beliefs about employment offers or injuries had nothing to do with her will. Although her false belief that Caveators were stealing from her and mismanaging her finances angered Decedent and caused her to execute a new will in 2014, the evidence shows that Decedent came to this belief based on false information Marian provided. That Decedent may have been duped by Marian does not establish that her mind was unsound. See Brumbelow v. Hopkins, 197 Ga. 247, 250 (1) (29 SE2d 42) (1944); see also Boney, 265 Ga. at 840 (1) ("An insane delusion does not mean a mistaken conclusion from a given state of facts, nor a mistaken belief as to the existence of facts." (citation and punctuation omitted)). Caveators' allegations that Marian was a bad actor and caused strife among her family such that Decedent changed her will are beside the point; the claims predicated upon those allegations were rejected by the jury and are not on appeal here.

10

the Caveators' claim that Decedent lacked testamentary capacity failed as a matter of law. We therefore reverse the trial court's judgment, including the award of attorneys' fees to Caveators.

Judgment reversed. All the Justices concur.

Decided October 30, 2017.

Wills. Gwinnett Probate Court. Before Judge Ballar.

Stanley M. Lefco, for appellant.

Mahaffey Pickens Tucker, Gerald Davidson, Jr., Christopher D. Holbrook, for appellees.