**FIFTH DIVISION**
**MCFADDEN, P. J.,**
**RICKMAN and MARKLE, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**February 22, 2019**

# In the Court of Appeals of Georgia

A18A2104. WOODS v. STONECIPHER.

MCFADDEN, Presiding Judge.

This appeal concerns a dispute over a will executed in 2010 by Charlotte Blalock. The will names Blalock's granddaughter, Amber Stonecipher, as executor. When Stonecipher petitioned to probate the will, Nancy Woods, who was Blalock's daughter and Stonecipher's aunt, filed a caveat challenging the will on the grounds that Blalock lacked testamentary capacity and was either under duress or unduly influenced when she signed it. Woods also sought to have the estate pay an outstanding debt secured by real property that she and Blalock jointly owned, with rights of survivorship, at the time of Blalock's death.

On a de novo appeal from various probate court rulings, and following a bench trial, the superior court upheld the 2010 will and held that the estate had no obligation to pay the outstanding debt secured by the real property. Woods challenges both of these rulings on appeal. We affirm the ruling upholding the will because the evidence

supported the superior court's findings that Blalock was competent to make it and that she was neither under duress nor unduly influenced at the time. But we reverse the ruling regarding the outstanding debt because the language of the will clearly expresses the intention that the estate pay that debt.

1. *Ruling upholding 2010 will.*

The parties strongly contest the facts relevant to the superior court's decision to uphold the 2010 will, and at the bench trial they presented conflicting evidence on that issue. On appeal, we must view the evidence in the light most favorable to the decision. See *Burchard v. Corrington*, 287 Ga. 786 (700 SE2d 365) (2010).

So viewed, the evidence presented to the superior court shows that Blalock executed the will in question on November 30, 2010. Her health was in decline at the time, and earlier in the year she had asked Stonecipher to move into her house to help her. Blalock had raised Stonecipher from the time Stonecipher was a young girl and the two had a mother-daughter relationship. Stonecipher became Blalock's primary caregiver; she helped Blalock maintain the house, took her to medical appointments, and performed other services for her.

In late October or early November, 2010, Blalock told Stonecipher that she wanted to update her will. Stonecipher hired an attorney, who reviewed Blalock's

prior will and information from Blalock that he received through Stonecipher, met with Blalock in person twice at Blalock's home to discuss the will's terms, gave her a copy of a draft will to review, and made corrections to it at her direction. The final draft of the new will differed from Blalock's former will in three main ways: by naming Stonecipher executor; by giving the house in which Blalock then lived to Stonecipher; and by making Stonecipher the residual legatee.

Blalock signed the new will on November 30, 2010 in the presence of the attorney, Stonecipher, and two neighbors who had known her for many years. She also signed a self-executing affidavit in which she averred, among other things, that the 2010 will was her "last will and testament[,] that [she] had willingly made and executed it as a free act and deed for the purposes expressed therein[, and] that she was . . . of sound mind[.]" The two subscribing witnesses signed this affidavit as well. Blalock also executed, before the two witnesses, a power of attorney in favor of Stonecipher.

The two subscribing witnesses signed a separate affidavit in which they testified, among other things, that Blalock had "declared the instrument to be her will" and "was, at the time the will was executed, over the age of eighteen, and, to the best of the knowledge of [the subscribing witnesses], of sound mind and not under

3

any constraint or in any respect incompetent to make a will." When she executed the 2010 will, Blalock seemed coherent and aware, with a good understanding of what was happening. She had read the will. She indicated to one of the subscribing witnesses[1] that she knew she was signing a new will. She told him she had worked with the attorney to draft the new will and that it was what she wanted. She did not appear confused or under duress, and it did not appear that she had been influenced to sign the new will.

In his order upholding the 2010 will, the superior court found that Blalock "was able to make competent decisions at the time of the execution of [the will], that there [was] insufficient evidence to show that [she] was unduly influenced in the making or execution of [the will], and that there [was] insufficient evidence to show that [she] was under duress at the time of the making and execution of [the will]." Woods argues on appeal that the evidence did not authorize the superior court to make these findings. But she must clear a high hurdle to prevail on this claim of error. On appeal, we will not disturb the factfinder's determination if it supported by any evidence. See *Meadows v. Beam*, 302 Ga. 494, 497 (2) (807 SE2d 339) (2017);

---

[1] Only one of the two subscribing witnesses testified at the trial; the other was out of the state on vacation.

4

*Burchard*, 287 Ga. at 788 (1). Moreover, "in reviewing this question [of the sufficiency of the evidence] in the context of a challenge to a will, a stringent standard must be met in order to set aside a will, as this deprives a person of the valuable right to make a will." *Meadows*, supra at 497-498 (2) (citation omitted).

(a) *Testamentary capacity.*

Woods's challenge to Blalock's competence is a challenge to her testamentary capacity. "Testamentary capacity exists when the testator has a decided and rational desire as to the disposition of property." OCGA § 53-4-11 (a). The requirement of testamentary capacity

> is fulfilled with a showing that the testator understood that the will had the effect of disposing of her property at the time of her death, was capable of remembering generally what property was subject to disposition by will, was capable of remembering those persons related to her, and was capable of expressing an intelligent scheme of disposition.

*Meadows*, 302 Ga. at 498 (2) (citation and punctuation omitted).

Stonecipher presented evidence which supported the superior court's finding that Blalock had the necessary testamentary capacity to make the 2010 will. Persons present when Blalock executed the will testified that she was lucid and understood

what she was doing. See *Amerson v. Pahl*, 292 Ga. 79, 80 (1) (734 SE2d 399) (2012); *Mosley v. Warnock*, 282 Ga. 488, 489-490 (2) (651 SE2d 696) (2007). The subscribing witnesses stated in their affidavit that Blalock was mentally competent when she executed the will. And because the 2010 will was self-proved, in that it contained an affidavit complying with OCGA § 53-4-24, "a presumption existed that the will [was] executed with the requisite testamentary formalities, including that [it was] executed by a person apparently with sufficient mental capacity to do so, and [Woods] had a burden to rebut this presumption." *Meadows*, supra at 498 (2) (citations omitted).

The trial evidence did not compel a finding that Woods rebutted the presumption of Blalock's testamentary capacity. There was evidence of Blalock's fragility around the time she signed the will; she was in failing health and under hospice care, on medication, confined to her bed, and sometimes confused. But "[n]either advancing age nor weakness of intellect nor eccentricity of habit or thought is inconsistent with testamentary capacity to make a will." OCGA § 53-4-11 (d). "[T]estamentary capacity may be possessed by weak-minded or feeble individuals. And anything less than a total absence of mind does not destroy testamentary capacity." *Meadows*, supra at 498 (2) (citation and punctuation omitted). See *Webb*

6

*v. Reeves*, 299 Ga. 760, 762 (791 SE2d 35) (2016) (evidence that testator was not lucid at times does not demand finding that testator was not lucid when he executed will). As stated above, persons present when Blalock signed the will testified that she was lucid on that day.

Woods argues that the provision in the 2010 will purporting to give to Stonecipher the house in which Blalock lived shows Blalock's lack of testamentary capacity, because Blalock's ownership interest in that property — a joint tenancy with Woods with survivorship rights — was not subject to disposition by will. Viewed in the light most favorable to the superior court's judgment, however, Blalock's attempt to dispose of the house by will suggests that she simply did not understand the legal ramifications of her joint-tenancy ownership interest. Given the other evidence of Blalock's testamentary capacity, the superior court was not compelled to find that Blalock was not "capable of remembering *generally* what property was subject to dispostion by will[.]" *Meadows*, supra (emphasis supplied). See *Webb*, supra at 761 (requirement that testator remember generally what property is subject to disposition "does not require the testator to know the precise property holdings of which his estate consists"); *Patterson-Fowlkes v. Chancey*, 291 Ga. 601, 603 (732 SE2d 252) (2012) (testator's mistaken claim of ownership over two tracts of land that she had,

7

in fact, purchased for others did not require a finding that she lacked testamentary capacity); *Ashford v. Van Horne*, 276 Ga. 636, 637 (1) (580 SE2d 201) (2003) (testator's misunderstanding regarding beneficiary designations on life insurance policies did not require a finding that he lacked testamentary capacity).

(b) *Undue influence and duress.*

"A will must be freely and voluntarily executed. A will is not valid if anything destroys the testator's freedom of volition, such as . . . duress[ ] or undue influence whereby the will of another is substituted for the wishes of the testator." OCGA § 53-4-12. "To invalidate a will, undue influence must amount to deception or coercion that destroys the testator's free agency." *Amerson*, 292 Ga. at 80 (2) (citation and punctuation). Woods argues that "the overwhelming weight of the evidence shows that [Blalock] was unduly influenced and controlled by Stonecipher." But the decision she cites in support of this argument, *Skelton v. Skelton*, 251 Ga. 631, 634 (5) (308 SE2d 383) (1983), emphasizes that this issue is, in most cases, a question for the factfinder. The superior court, as factfinder in this case, found that the evidence did not show that Blalock was unduly influenced or under duress.

We find no error. "The testimony of those who witnessed the execution of the will supports the finding that [Blalock] executed it freely and voluntarily." *Amerson*,

292 Ga. at 80 (2) (citation omitted). Given that Stonecipher was Blalock's granddaughter, was raised by Blalock as a daughter, and was Blalock's primary caregiver during her final illness, "the fact that she facilitated [Blalock's] making of the will under which she was [named executor and a significant] beneficiary does not by itself establish that she exercised undue influence." Id. (citation omitted). Likewise, "the fact that [Stonecipher] had an opportunity to exert undue influence is insufficient to support a finding thereof." *Kendrick-Owens v. Clanton*, 271 Ga. 731, 733 (524 SE2d 237) (1999) (citation omitted). See also *In re Estate of Diaz*, 271 Ga. 742, 744 (2) (524 SE2d 219) (1999) ("Evidence showing nothing more than an opportunity to influence and a substantial benefit under the will does not establish the exercise of undue influence.") (citation omitted). While Woods attempts to cast suspicion on the circumstances surrounding the creation of the new will, "[t]he indulgence of mere suspicion of undue influence will not be allowed." *Kendrick-Owens*, supra (citation and punctuation omitted).

2. *Ruling regarding outstanding secured debt.*

Woods challenges the superior court's ruling that the estate was not responsible for paying an outstanding debt of Blalock's that was secured by the real property that

passed to Woods outside of the estate. This ruling conflicts with the terms of Blalock's will, so we reverse.

At the time of Blalock's death, she and Woods held joint title, with rights of survivorship, to the house in which Blalock lived. Woods became the sole owner of that property upon Blalock's death without the property passing through Blalock's estate. See *Manders v. King*, 284 Ga. 338, 340 n. 2 (667 SE2d 59) (2008) (title to property that is the subject of a joint tenancy with right of survivorship "vests in the survivor immediately at the death of the joint tenant and is never a part of the estate"). That property, however, was subject to a deed to secure debt that encumbered both Woods's and Blalock's interests in the property because it was executed by them both, cf. *Biggers v. Crook*, 283 Ga. 50, 51-53 (1) (656 SE2d 835) (2008), but which secured a loan for which only Blalock was liable.

The question of whether the estate is liable for the outstanding debt on that loan turns on the language of Blalock's will. Georgia adheres to the common-law doctrine of exoneration. *Manders*, 284 Ga. at 339. Under that doctrine, an heir or devisee of real property may seek satisfaction of liens on the property from the estate unless the will specifically provides otherwise. Id. But a surviving tenant of a joint tenancy with right of survivorship "does not qualify for exoneration of [a debt secured by the

10

property] *unless there is language in the decedent's will clearly expressing an intention that the debt be paid.*" Id. (citation, punctuation and footnote omitted; emphasis supplied).

Pertinently, Blalock's will states: "I direct that all debts, costs and expenses be paid out of the Residuary Estate and not be paid out of, charged or apportioned to or contributed by . . . any recipient or joint-owner of any property passing outside this will[.]" This provision clearly expresses the intent that the estate, rather than Woods, will be responsible for paying Blalock's outstanding debt encumbering the property that passed outside the will to Woods, a joint tenant with right of survivorship. The superior court erred in ruling otherwise.

*Judgment affirmed in part, reversed in part. Rickman and Markle, JJ., concur.*