**FIRST DIVISION**
**MERCIER, C. J.,**
**BARNES, P. J., and BROWN, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**June 26, 2025**

# In the Court of Appeals of Georgia

A25A0381. GEORGIA BONE & JOINT SURGEONS, P. C. v. KEEL.

A25A0382. KEEL v. GEORGIA BONE & JOINT SURGEONS, P. C. et al.

A25A0383. GEORGIA BONE & JOINT SURGEONS, P. C. v. KEEL.

A25A0384. GEORGIA BONE & JOINT SURGEONS, P. C. v. KEEL.

MERCIER, Chief Judge.

In 2018, Dr. Bradford Wall, a partner at Georgia Bone & Joint Surgeons, P. C. ("GBJ"), performed a total knee replacement on Margaret Keel. While she was recovering from the surgery, during her overnight stay at GBJ, Keel suffered a brain injury. She filed the underlying medical malpractice action against GBJ, Wall, and nurse Valerie Blankenship. The jury found in favor of Keel and against GBJ in the

amount of $6,500,000.[1] In these related appeals, GBJ argues that the trial court erred by refusing to give two of its requested jury instructions and that there was insufficient evidence to support a finding of causation (A25A0381); that the trial court erred by awarding Keel $1,820,000 in attorney fees (A25A0383); and that the trial court erred by imposing a supersedeas bond (A25A0384.) In a cross-appeal, Keel contends that, if we reverse the judgment and order a new trial, we should also find that certain of the trial court's evidentiary rulings were erroneous (A25A0382).[2]

For the following reasons, we affirm the trial court's judgment in A25A0381 and the award of attorney fees in A25A0383. Accordingly, Keel's cross-appeal, A25A0382, is dismissed as moot. However, we vacate and remand the trial court's order for a supersedeas bond in A25A0384.

On appeal of a jury verdict, we view the evidence in the light most favorable to the prevailing party. *Meadows v. Beam*, 302 Ga. 494, 495 (1) (807 SE2d 339) (2017). So viewed, the evidence shows that, on January 30, 2018, Wall performed a total knee replacement surgery on Keel at GBJ. The surgery was successful, and Keel was

---

[1] The jury found in favor of Wall and Blankenship.

[2] However, Keel concedes that her cross-appeal is moot if we affirm the trial court's judgment.

brought to GBJ's post-anesthesia care unit, then to a room in GBJ to stay overnight for care and observation. Keel was prescribed narcotic pain medications for her recovery. The narcotics can slow a patient's breathing rate, which is a risk for patients like Keel, who suffer from obesity and sleep apnea, and require a continuous positive airway pressure ("CPAP") machine.

On January 30, 2018, GBJ staffed two nurses, Blankenship and Jackie Croft, to provide care for the overnight patients. At approximately 11:00 p.m., Blankenship went into Keel's room to provide antibiotics and discovered that Keel's CPAP mask had been removed and that Keel was unresponsive. Blankenship could not find Keel's pulse and called for Croft. When Croft arrived, they began performing cardiopulmonary resuscitation ("CPR") on Keel. At approximately 11:17 p.m., Blankenship called emergency services.

Blankenship procured, and Croft administered, Narcan in an attempt to counteract the narcotics Keel had in her system, then Blankenship resumed performing CPR. An ambulance arrived at 11:21 p.m.. Emergency medical technicians determined that Keel was in ventricular fibrillation and shocked her using the defibrillator prior to leaving GBJ for the hospital. While at the hospital, Keel was put

into a medically induced coma, in order to "save [her] brain." Ultimately, Keel suffered a hypoxic brain injury due to her cardiac arrest while in recovery at GBJ. As a result, Keel suffers from significant limitations on her mobility and independence, and she had to move into an assisted living home.

Keel filed a lawsuit against GBJ and Blakenship for medical malpractice, and she later added Wall as a defendant. Following the trial, the jury found Wall and Blankenship not liable, but found GBJ liable and awarded Keel $6,500,000. In entering judgment, the trial court added prejudgment interest in the amount of $573,791.73.

*A25A0381*

1. GBJ argues that Keel failed to put forth sufficient evidence of causation for her malpractice claim against GBJ. . We "can only set a verdict aside, on evidentiary grounds, as being contrary to law in that it lacks *any evidence* by which it could be supported." *Cook v. Huff*, 274 Ga. 186, 186 (1) (552 SE2d 83) (2001) (citation and punctuation omitted, emphasis supplied).

In order to recover for a medical malpractice claim, a plaintiff must show: "(1) the duty inherent in the doctor-patient relationship; (2) the breach of that duty by failing to exercise the requisite degree of skill and care; and (3) that this failure be the

proximate cause of the injury sustained." *Zwiren v. Thompson*, 276 Ga. 498, 499 (578 SE2d 862) (2003) (citation and punctuation omitted). See also OCGA § 51-1-27. Simply put, "a plaintiff cannot recover for medical malpractice, even where there is evidence of negligence, unless the plaintiff establishes by a preponderance of the evidence that the negligence either proximately caused or contributed to cause plaintiff harm." *Zwiren*, 276 Ga. at 500 (citation and punctuation omitted). However, "[q]uestions regarding causation are peculiarly questions for the jury except in clear, plain, palpable and undisputed cases." *Adams v. Piedmont Henry Hosp.*, 365 Ga. App. 257, 266 (1) (878 SE2d 113) (2022) (citation and punctuation omitted).

Keel's expert, Dr. Timothy Harwood, testified that GBJ was responsible for ensuring that the surgery center was properly staffed in the event of a code and that GBJ violated the standard of care by under-staffing the surgery center. Due to insufficient staffing, the nurses were unable to properly monitor Keel and failed to perform a sufficient advance cardiac life support ("ACLS") because there were only two nurses on duty. In order to perform a full code, at least four people are needed. Further, Keel had been given narcotics, suffered from obesity and sleep apnea, and required additional monitoring. According to Harwood, the insufficient staffing

breached the standard of care. Harwood further testified that, had GBJ staffed sufficiently and a proper code been performed, Keel's outcome would have improved because there would have "been less deprivation of oxygen to the brain."

In her trial testimony, Blankenship conceded that it was difficult to conduct the ACLS protocol with only one other nurse. In addition, Croft conceded that she and Blakenship, as a two person team, could not conduct a code, and she stated: "[A]n ACLS code team involves a minimum of 6 people and they each have a specific job. We were 2 people, and 2 people can't be 6 people. We had to choose the most important jobs that we could do to keep Ms. Keel alive."

Keel presented sufficient evidence to prove causation by a preponderance of the evidence. Specifically, Harwood testified that insufficient staffing by GBJ breached the standard of care and made it impossible for Croft and Blankenship to perform a full ACLS code. Further, he testified that, had a full ACLS code been performed, Keel's condition would have improved. Accordingly, this claim of error lacks merit. See *Med. Center of Central Ga. v. Turner*, 372 Ga. App. 644, 651-652 (1) (905 SE2d 858) (2024) (sufficient evidence of causation elicited where expert opined that had the doctor conducted a CT scan prior to surgery, the chance of the doctor mistakenly

6

cutting a patient's artery would have been "a lot less") (emphasis omitted) (vacated on other grounds by *Med. Center of Central Ga. v. Turner*, ___ Ga. ___ (S25G0132) (June 24, 2025)); *Moore v. Singh*, 326 Ga. App. 805, 808-810 (1) (755 SE2d 319) (2014) (reversed grant of directed verdict because plaintiff put forth evidence that the doctor's missed diagnosis of a nondisplaced fracture of the plaintiff's knee resulted in a two month lack of treatment or a more complicated surgery or recovery period).

2. GBJ argues that the trial court erred by failing to give two of its requested jury instructions. We conduct a harmless error review of a trial court's refusal to give a requested charge. *Poppell v. Cardinal Health*, 319 Ga. 670, 683 (2) (906 SE2d 389) (2024).

(a) GBJ requested that the trial court give a "differing view" instruction, citing *Condra v. Atlanta Orthopaedic Group*, 285 Ga. 667 (681 SE2d 152) (2009). In *Condra*, the Georgia Supreme Court held that "evidence regarding an expert witness' personal practices, unless subject to exclusion on other evidentiary grounds, is admissible both as substantive evidence and to impeach the expert's opinion regarding the applicable standard of care." Id. at 669 (1). The Supreme Court stated that:

> any potential confusion created by the admission of [expert personal practice] evidence may be remedied through the use of careful jury

instructions. Such instructions should, for example, clearly define the legal meaning of standard of care; enunciate the principle that a mere difference in views between physicians does not by itself prove malpractice, and clarify concepts such as burden of proof and credibility of witnesses.

Id. at 672 (1) (citation omitted).

GBJ's requested charge stated:

The mere fact that a medical provider may have personally treated the patient differently does not, by itself, imply that medical malpractice occurred, unless the evidence is that a standard of care violation occurred. A mere difference in the personal views and practices between medical providers does not by itself prove malpractice. To the contrary, the plaintiff must prove by a preponderance of the evidence that the standard of care was violated, not merely a difference in personal views or practices.

The trial court considered the request and stated that the requested instruction, as written, was "very hard to follow," was repetitive of the standard of care charge, and, ultimately, unnecessary. Further noting that the requested charge was not a pattern jury instruction, could unnecessarily confuse the jury and added little to their understanding, the trial court declined to give the charge. Following the jury charge,

8

GBJ renewed its objection. GBJ now argues that the trial court erred by refusing to give the requested instruction.

In our review of whether the denial of a requested charge was an error, we examine the given jury charges as a whole. *Atlantic Star Foods v. Burwell*, 368 Ga. App. 79, 82 (1) (889 SE2d 202) (2023). Here, the trial court instructed the jury that:

> A person professing to practice surgery or the administering of medicine for compensation must bring to the exercise of the profession a reasonable degree of care and skill. Any injury resulting from a want of such care and skill shall be an act for which a recovery may be had. This standard, when applied to the facts and circumstances of any particular case, must be of such degree of care and skill as under [ ] *similar circumstances and conditions and like surrounding circumstances, it is ordinarily employed by the profession generally*.

(emphasis supplied).

The trial court also instructed:

> If a physician or surgeon, in the treatment and care of a patient, should use that degree of care and skill *ordinarily employed by the profession generally*, under similar or certain conditions and like surrounding circumstances, then the physician or surgeon would not be negligent. Therefore, there could . . . be no finding of malpractice.

(emphasis supplied).

9

The jury was also instructed that it was "not required to accept the testimony of any witness, expert of otherwise. Testimony of an expert, like that of all witnesses, is to be given only such weight and credit as you think it is properly entitled to receive." As such, the jury was properly informed that it was to look to common practices of the medical profession and that it could disregard expert testimony.

Further, while experts testified regarding their personal practices, GBJ has failed to point to testimony by Harwood, the expert who testified regarding GBJ's breaches of the standard of care, that his personal practices exceeded the standard of care. Harwood's testimony indicated that, by under-staffing the recovery area, GBJ breached the standard of care because the facility did not have adequate staffing to follow ACLS protocol. While GBJ points to two times where Harwood relied on his personal experiences in order to determine the standard of care, unlike in *Condra*, GBJ has failed to point to any testimony where Harwood's personal practices *exceeded the standard of care*.[3] Compare *Condra*, 285 Ga. at 668 (defense expert's testimony that it was his personal practice to conduct blood count monitoring when the anti-convulsive drug Tegretol was prescribed, despite it not being standard of care,

---

[3] Similarly, GBJ failed to point to any testimony by the defense experts that their personal practices exceeded the standard of care.

was admissible). As such, there was no need to address the difference between the expert's personal practice and the standard of care, as no such difference was shown. Considering the charge as a whole, and the testimony given by Harwood, we conclude that the jury was adequately charged regarding how to evaluate the expert testimony and the standard of care. Even assuming that the trial court's refusal to include the requested charge on personal practices was error, the refusal "was not 'inconsistent with substantial justice,' OCGA § 9-11-61,[4] and was therefore harmless." *Poppell*, 319 Ga. at 685 (2); see also *Atlantic Star Foods*, 368 Ga. App. at 82 (1) ("[I]f the jury charge as a whole accurately and fully apprised the jury of the law to be applied in its deliberations, then the refusal to give an additional instruction, even if that additional

---

[4] OCGA § 9-11-61 provides in relevant part that:

[N]o error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

instruction were accurate, does not amount to error.") (citation and punctuation omitted).

(b) GBJ argues that the trial court erred by not giving a "no guarantee" jury charge. The requested charge stated:

> I charge you that a medical provider does not guarantee the results of treatment and that in the absence of a breach of the standard of care, proof that the outcome of treatment was different from that expected or was followed by disastrous instead of beneficial results neither establishes nor supports an inference that the standard of care was violated.

The trial court found that the charge was "duplicative and . . . wordy," concluded that the standard of care pattern charge sufficiently provided the relevant law, and refused to give the requested charge. Following the charge of the court, GBJ renewed its objection.

While the trial court refused to provide the no guarantee jury charge, the trial court gave another one of GBJ's requested jury charges, over Keel's objection, which stated that: "I charge you that negligence cannot be inferred by the mere happening of an event. The only way the plaintiff can recover is if she shows that her damages were proximately caused by specific acts of professional negligence on the part of the

Defendant." The trial court also provided another similar charge requested by GBJ, instructing that: "Innocence on the part of the Plaintiff . . . or the patient or any absence of blame on her part does not establish negligence. The fact that a patient may have sustained harm through no fault of her own is not sufficient by itself for you to conclude that a defendant was negligent." The trial court also instructed the jury that the presumption in medical malpractice cases "is that the services were performed in an ordinarily skillful manner."

The trial court correctly instructed the jury regarding the plaintiff's burden of proof and the presumption that GBJ performed its services in an ordinarily skillful manner. As such, again, even assuming that the trial court's refusal to include the requested charge was an error, it was harmless. *Poppell*, 319 Ga. at 685 (2); see also *Rowe v. Tyson*, 361 Ga. App. 885, 889 (4) (a) (864 SE2d 170) (2021) (no error when defendant's requested charge was generally covered by the other jury charges). Accordingly, we affirm the trial court's judgment in A25A0381.

*A25A0382*

3. In a cross-appeal, Keel contends that the trial court erred in certain evidentiary rulings. She concedes, however, that this claim needs to be addressed only

if we reverse the trial court's judgment and order a new trial. Given that we affirmed the trial court's judgment in *A25A0381*, Keel's appeal is moot and therefore dismissed.

*A25A0383*

4. GBJ argues that the trial court erred by awarding Keel $1,820,000 in attorney fees pursuant to OCGA § 9-11-68 (b) (2).[5] Section 9-11-68 (b) (2) "provides a sanction in the form of attorney fees and litigation expenses incurred after the failure to accept what the statute defines as a reasonable settlement offer." *Junior v. Graham*, 313 Ga. 420, 420 (870 SE2d 378) (2022). GBJ argues that the trial court erred because the attorney fee award of $1,820,000 was "excessive and contrary to law." As "the reasonableness of fees and costs is a matter within the trial court's discretion, [we] will not interfere with the decision of the trial court unless there has been an abuse of that discretion." *Junior v. Graham*, 374 Ga. App. 497, 498 (911 SE2d 241) (2025) (citation and punctuation omitted).

---

[5] "If a plaintiff makes an offer of settlement which is rejected by the defendant and the plaintiff recovers a final judgment in an amount greater than 125 percent of such offer of settlement, the plaintiff shall be entitled to recover reasonable attorney's fees and expenses of litigation incurred by the plaintiff or on the plaintiff's behalf from the date of the rejection of the offer of settlement through the entry of judgment." OCGA § 9-11-68 (b) (2).

On February 10, 2021, after the lawsuit had been pending for over two years, Keel sent a $2,000,000 demand to the defendants pursuant to OCGA § 9-11-68. The offer expired on March 12, 2021, and GBJ did not accept the offer of settlement.

Following the jury's verdict of $6,500,000, which was greater than 125 percent of Keel's offer of settlement, Keel filed a motion for attorney fees and expenses pursuant to OCGA § 9-11-68 (b) (2). In support of her motion for attorney fees, Keel submitted her attorney client agreement, which provided that her counsel was entitled to 40 percent of her recovery. She also submitted affidavits from her attorneys, who described their experience and provided estimates of the hours worked by the counsel and a paralegal in their practice before and after Keel made her offer of settlement. Keel's counsel also averred that the 40 percent contingency fee arrangement was reasonable and customary for a case of this complexity and magnitude.

GBJ does not contend that Keel's offer of settlement was made in bad faith. Instead, it argues that the trial court failed to properly determine the amount of reasonable attorney fees, and relied solely on the contingency fee agreement to determine the amount.

In order to determine the amount of attorney fees to award under OCGA § 9-11-68 (b),

> [a] court may consider a contingent fee agreement and the amount it would have generated as evidence of usual and customary fees in determining both the reasonableness and the amount of an award of attorney fees. When a party seeks fees based on a contingent fee agreement, however, the party must show that the contingency fee percentage was a usual or customary fee for such case and that the contingency fee was a valid indicator of the value of the professional services rendered. In addition, the party seeking fees must also introduce evidence of hours, rates, or some other indication of the value of the professional services actually rendered.

*Ga. Dept. of Corrections v. Couch*, 295 Ga. 469, 483 (3) (a) (759 SE2d 804) (2014) (citation and punctuation omitted).

Here, the trial court found that the 40 percent contingency fee agreement was reasonable and customary under the circumstances of the underlying complex medical malpractice case. The trial court also took note of the estimated 215 combined hours of partner time and 50 hours of paralegal time spent on the matter for Keel prior to issuing her demand. The trial court went on to cite the five years of litigation, multiple experts and over 700 hours working on the matter, to find that "[g]iven the risk, time

16

and expense involved, the 40% contingency fee is reasonable and in line with what other attorneys of similar skill and relevant experience would charge for a similar matter."

To arrive at the amount of the award, the trial court calculated the "pro-rata portion of the work performed after expiration of the offer. . . . Approximately 70% of the work done by [Keel's] attorneys and their paralegals was performed after the rejection of the offer of settlement. Therefore the fee due under that approach would be $1,820,000 (i. e. 70% of $2,600,000)."[6]

"[T]he trial court was entitled to consider [Keel's] contingency fee agreement with [her] attorneys and the amount it would have generated as evidence of their usual and customary fees[.]" *Couch*, 295 Ga. at 484 (3) (a). Further, the trial court did not rest its award of attorney fees solely on the contingency fee arrangement. It looked also at evidence of counsel's hours and rates to determine the value of attorney fees rendered and to assess whether the contingency fee amount was appropriate. See id. Keel "presented not only her contingency-fee agreement but also evidence that the contingency fee was customary for this kind of case, and evidence of the amount and

---

[6] $2,600,000 is 40 percent, the contingency fee agreement percentage, of the total amount awarded by the jury, $6,500,000.

type of work done by the many attorneys who represented her." *Taylor v. Devereux Foundation*, 316 Ga. 44, 94 (VIII) (B) (885 SE2d 671) (2023). Accordingly, "we cannot say that the trial court erred by concluding that the standard . . . articulated in *Couch* was met." Id. The trial court acted within its discretion in its attorney fee award. *Cajun Contractors v. Peachtree Property Sub*, 360 Ga. App. 390, 404, 405-409 (2) (b)-(c) (861 SE2d 222) (2021) (trial court did not abuse its discretion by finding that plaintiff presented sufficient evidence of value of professional services rendered through the 40 percent contingency fee agreement and affidavits from counsel regarding the complexity of the case, the expertise of counsel and the amount of work performed and by applying a multiplier to the value of services due to "outstanding work by [plaintiff's] counsel in obtaining such a substantial verdict").

*A25A0384*

5. Finally, GBJ argues that the trial court erred by imposing a supersedeas bond in the amount of $7,500,000, and that the amount of the supersedeas bond was an amount it could not pay. We review a trial court's order of a supersedeas bond for an abuse of discretion. *Gaslowitz v. Stabilis Fund I*, 331 Ga. App. 152, 157 (3) (770 SE2d 245) (2015).

Keel moved for a supersedeas bond under OCGA § 5-6-46, requesting a bond in the amount of $7,750,000. Pursuant to OCGA § 5-6-46 (a):

> In civil cases, the notice of appeal filed as provided in Code Sections 5-6-37 and 5-6-38 shall serve as supersedeas upon payment of all costs in the trial court by the appellant and it shall not be necessary that a supersedeas bond or other form of security be filed; provided, however, that *upon motion by the appellee, made in the trial court before or after the appeal is docketed in the appellate court, the trial court shall require that supersedeas bond or other form of security be given with such surety and in such amount as the court may require,* conditioned for the satisfaction of the judgment in full, together with costs, interest, and damages for delay if the appeal is found to be frivolous.

(emphasis supplied.)

However, "[i]n all civil cases where the party taking an appeal files an affidavit stating that because of his indigence he is unable to pay costs or to post a supersedeas bond, if any, as may be required by the trial judge as provided in Code Section 5-6-46, the notice of appeal and affidavit of indigence shall act as supersedeas." OCGA § 5-6-47 (a). GBJ opposed the motion for supersedeas bond, and Wall filed an affidavit of indigence, stating that GBJ could not obtain a bond because it is "not able to provide or pledge sufficient collateral to post the requested bond."

19

While "[a]ny party at interest or his agent or attorney may contest the truth of the affidavit of indigence by verifying affirmatively under oath that the same is untrue[,]" OCGA § 5-6-47 (b), Keel did not file an affidavit in opposition. Instead, Keel requested that the trial court grant the motion for supersedeas but "delay ruling on the amount of [the] bond, so as to allow [Keel] to conduct post-judgment discovery" to traverse Wall's affidavit. The statute further requires that following a traverse, the issue "shall be heard and determined by the trial court under the rules of the court." OCGA § 5-6-47 (b). Without ruling on, or even addressing, Wall's affidavit and claim of indigence on behalf of GBJ, or holding a hearing on the claim of indigence, the trial court granted the motion for supersedeas bond in the amount of $7,500,000.

Here, there was no traverse, hearing or findings regarding Wall's indigence affidavit. See *In re Estate of Woodall*, 374 Ga. App. 16, 21 (2) (910 SE2d 830) (2024) ("[A] trial court's discretion when reviewing an affidavit of indigence is not appealable, and . . . a trial court's findings concerning a party's indigence are not reviewable in cases where the affidavit of indigence has been traversed.") (citation and punctuation omitted); see also OCGA § 5-6-47 (b) ("The judgment of the court on

all issues of fact concerning the ability of a party to pay costs or give bond shall be final."). Because Keel did not file a traverse, no hearing was held, and we cannot determine if the trial court found that GBJ was not indigent, we vacate the trial court's order regarding the supersedeas bond and remand for further proceedings consistent with this opinion. See generally *Coleman v. Coleman*, 281 Ga. 101, 102 (636 SE2d 527) (2006) ("When, as here, an appellate court cannot determine whether a trial court has exercised discretion, the proper remedy is to remand the case to the trial court.").

*Judgment A25A0381 affirmed, A25A0382 dismissed, A25A0383 affirmed, A25A0384 vacated and remanded. Barnes, P. J., and Brown, J., concur.*