**FOURTH DIVISION**
**MERCIER, C. J.,**
**DILLARD, P. J., and LAND, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

**June 5, 2025**

# In the Court of Appeals of Georgia

A25A0588. THAKKAR v. PARIKH.
A25A0589. THAKKAR et al. v. PARIKH.

MERCIER, Chief Judge.

Following a jury trial in this fraud case and the subsequent denial of their "motion for JNOV, new trial, or remittitur," Chittranjan Thakkar and Green Chillies, LLC (sometimes collectively referred to as "Defendants") appeal from the verdict that awarded Dr. Naresh Parikh the following amounts: $145,000 solely against Thakkar for his failure to repay three promissory notes that he personally guaranteed on behalf of Green Chillies, a company managed by Thakkar; $650,000 jointly against Thakkar and Green Chillies for fraudulently inducing Parikh to invest in certain restaurants in return for an unfulfilled promise of ownership in those restaurants; $525,025.36 against Thakkar and Green Chillies jointly for Parikh's attorney fees

pursuant to OCGA § 13-6-11, and $65,000,000 against Thakkar and Green Chillies jointly for punitive damages.[1] Among other things, Defendants maintain that there was insufficient evidence of fraud and that the punitive damages award was constitutionally excessive. For the reasons set forth below, we affirm the jury's verdict regarding the promissory notes, fraud, and attorney fees, but we vacate the award of punitive damages and remand the case for further proceedings on that issue.[2]

1. With regard to the jury's decision to award Parikh $650,000 for fraud, Defendants maintain that the trial court erred by denying their motion for judgment notwithstanding the verdict. We disagree.

When reviewing the denial of a motion for judgment notwithstanding the verdict or a denial of a motion for directed verdict, this Court must "determine whether there is any evidence to support the jury's verdict." *Patterson-Fowlkes v. Chancey*, 291 Ga. 601, 602 (732 SE2d 252) (2012). "In so doing, this Court must

---

[1] Although the trial court initially determined that the punitive damages award was subject to a $250,000 cap, see OCGA § 51-12-5.1 (g), it later determined that the cap was not required and reinstated the full amount.

[2] As Thakkar and Green Chilies raise the same contentions on appeal, we will consider their cases jointly in this opinion.

construe the evidence in a light most favorable to the prevailing party in the court below." Id.

Viewing the evidence in this light, the record shows that the business dispute at the heart of this matter involves three restaurants in which Parikh invested: (1) Gyro City (Hiram); (2) Gyro City (Roswell); and (3) Santorini Taverna. These restaurants, in turn, were owned by a complicated pyramid of holding companies that can be traced back to Gyro City Mediterranean, LLC, and Green Chillies. Gyro City Mediterranean was owned by Nirvana Restaurant Group, a company in which Parikh's son, Nirav Parikh, held an 80% interest and Vinod Patel held a 20% interest. Green Chillies was owned entirely by Thakkar and his family.

At trial, Parikh, who is a cardiologist, recounted that he met Thakkar as a social acquaintance, and they subsequently formed a friendship and began entering business ventures together. At some point later, Parikh and Thakkar discussed the restaurants in question, and, according to Parikh, Thakkar promised to transfer a one-third ownership in the restaurants to Parikh in return for his investments in their operations. These investments ultimately included $145,000 in promissory notes,[3] and

---

[3] This amount was comprised by three separate promissory notes entered into between Parikh and Green Chillies for $44,000, $73,000, and $28,000. Thakkar

3

an additional aggregate investment of approximately $2 million to cover ongoing restaurant expenses. Parikh testified that he was neither repaid on the notes nor provided any ownership in the restaurants in exchange for any of his investments. And, on cross-examination,[4] Thakkar admitted that, as the manager of Green Chillies, he had the ability to cause Green Chillies to transfer ownership interests "for the right commitments[,]" but he never transferred any interest to Parikh. Thakkar also testified that, at least for some time after April 2020, he had "exclusive control" over the restaurants.

As additional support to prove the existence of the promise to transfer ownership, Parikh provided several pieces of email correspondence, including: (1) a July 2019 instruction from Thakkar to a lawyer that "[w]e need to correct all ownership docs to reflect Doc['s] ownership." ; (2) an August 2019 email from Thakkar to Parikh and others stating: "NEED TO CORRECT OWNERSHIP ISSUES OF DOC ON RESTAURANTS[;]" and (3) a May 2020 email from Parikh to Thakkar stating: "My advise [sic] would be to pay all outstanding Leases[,] Cam[,]

personally guaranteed all three notes.

[4] Parikh testified and cross-examined Thakkar, but Defendants neither put up evidence nor called any witnesses.

Utility[, and] Insurance Asap[.] Then we can reconcile. With 33.36 shares for me[.]"
In addition, Parikh also introduced a proposed Amended Operating Agreement for one of the restaurant holding companies, Gateway Rest Group, LLC, along with a December 2019 cover email sending the proposed agreement from a lawyer to Thakkar and Parikh. Parikh also provided evidence that, although he was investing funds that were intended to go to the operation costs of the restaurants, Thakkar withdrew some of this money and placed it into his own personal business.[5]

During cross-examination, Parikh also questioned Thakkar about his history of unpaid debts that resulted in litigation. Parikh used this evidence to support both an argument that Thakkar made the promises to transfer ownership to Parikh without any intent to make good on the promise and an argument that Thakkar's recurring conduct, that was similar to his conduct with Parikh, should be punished by the issuance of an award for punitive damages. Thakkar, himself, testified that the corporate structure of his many businesses had been challenged many times, though

---

[5] Parikh testified that, in late 2019, Thakkar was withdrawing money that Parikh was investing in the restaurants and diverting it to one of Thakkar's personal companies – Jax Fairfield, LLC.

those challenges were not successful. And, to the extent that he wished to do so, Thakkar was allowed to explain the reasons for his past litigated business debts.

To recover for actual fraud, five elements must be shown: "a false representation by a defendant, scienter, intention to induce the plaintiff to act or refrain from acting, justifiable reliance by plaintiff, and damage to plaintiff." *Coe v. Proskauer Rose*, 314 Ga. 519, 526-527 (2) (878 SE2d 235) (2022) (citation and punctuation omitted). Defendants argue that the fraud claim must fail because (a) the promises underlying the claim were made to Parikh by parties other than Thakkar; (b) the promises were neither specific enough to be actionable nor made without a present intent to perform; and (c) there was no justifiable reliance by Parikh on the promises.[6] We will consider each contention in turn.

(a) First, with regard to the origin of the promise to transfer ownership, Defendants argue that it was made by individuals other than Thakkar. But Parikh testified at trial that, although others associated with the restaurants may have

---

[6] Defendants do not challenge the award of $145,000 for failure to repay promissory notes.

6

originally brought the investment opportunity to his attention,[7] it was actually Thakkar who specifically made representations to Parikh. This testimony was buttressed by the fact that the promissory notes were personally guaranteed by Thakkar and by the emails sent by Thakkar indicating the need to add Parikh as an owner of the restaurants. Viewed in the light most favorable to the verdict, this evidence supports the jury's finding that the promise to transfer ownership in the restaurants in exchange for the promissory notes was made by Thakkar. See *Patterson-Fowlkes*, 291 Ga. at 602.

(b) Defendants also contend that, even if Thakkar made promises to Parikh, they were neither specific enough to be actionable nor made without a present intent to perform. But the trial transcript of Parikh's testimony, which Defendants chose not to challenge with any evidence or testimony of their own, shows the existence of a promise and oral contract – the transfer of partial ownership in the restaurants in exchange for Parikh's investments. The transcript also indicates that Parikh made these investments, but Thakkar chose not to transfer any interests to Parikh despite

---

[7] Specifically, Defendants claim that the promises originated with George Tselios and Vinod Patel, who either had some part-ownership or management responsibilities for the restaurants. But Parikh testified that, although Patel sometimes accepted payments on behalf of Thakkar, all promises ultimately came from Thakkar.

an admitted ability to do so. Under these circumstances and viewed in the light most favorable to the verdict, there was sufficient evidence upon which the jury could determine that an enforceable agreement existed and that Thakkar simply had no intention to perform.[8] See *Patterson-Fowlkes*, 291 Ga. at 602.

(c) Finally, Defendants argue that Parikh did not justifiably rely on any of Thakkar's promises, contending that Parikh was a seasoned entrepreneur who should have known that Thakkar had no actual ability to transfer any level of ownership in the restaurants to him. But this argument ignores Thakkar's own testimony that he *could have* transferred at least some ownership interests if he chose to do so. Defendants' argument on appeal is a futile attempt to avoid Thakkar's own statement, which the

---

[8] We note that Thakkar's testimony at trial, considered in its entirety, is highly conflicting. For example, he testified at one point that he had the ability to transfer ownership interests to Parikh from Green Chillies "for the right commitments" ; at another point that he lacked the power to do so; and at yet another point that he had exclusive control of the restaurants. Defendants essentially invite us to reweigh this evidence in their favor. "However, an appellate court can only review the evidence to determine if there is any evidence to support the verdict. This Court does not reweigh the evidence, as the finder of fact, in this case the jury, is the final arbiter of the weight of the evidence and the credibility of witnesses." *Golden Isles Cruise Lines, Inc. v. Lowie*, 350 Ga. App. 1, 10 (2) (827 SE2d 703) (2019) (citations and punctuation omitted). Here, the jury credited testimony that Thakkar had the ability to transfer some level of ownership to Parikh, but chose not to do so in contravention of an earlier agreement.

jury credited. See *Barlow v. Veber*, 169 Ga. App. 65, 67 (3) (311 SE2d 501) (1983) ("It is the function of the jury, not the appellate courts, to determine the credibility of witnesses and weigh any conflicts in the evidence.").[9]

Given this evidence and testimony presented at trial, there was some evidence supporting the jury's determination that Defendants committed fraud. *Patterson-Fowlkes*, 291 Ga. at 602. Therefore, the trial court properly denied Defendants' motion for a judgment notwithstanding the verdict. Id.

---

[9] Within these contentions, Defendants also raise a statute of frauds defense that was not raised during trial. Even if we accept that this argument is applicable and has not been waived, partial performance provides an exception that defeats Defendants' statute-of-frauds defense. Partial performance "required to obviate the Statute of Frauds must be substantial and essential to the contract and which results in a benefit to one party and a detriment to the other." *Metzgar v. Reserve Ins. Co.*, 149 Ga. App. 404, 404 (254 SE2d 517) (1979). Here, Parikh not only loaned Thakkar $145,000 (evidenced by promissory notes), but he also advanced almost $2 million for restaurant operations in pursuit of the fulfillment of Thakkar's promise to transfer ownership. And, although, an "oral contract sought to be enforced based on part performance must be certain and definite in all essential particulars," *Price & Co. v. Majors Mgmt., LLC*, 363 Ga. App. 427, 432 (2) (b) (869 SE2d 587) (2022) (citation and pinctuation omitted), Parikh testified to those particulars, as recounted above, with no counter-evidence or testimony from Thakkar. And, despite evidence in the emails that Thakkar was well aware of the agreement to transfer, Thakkar never transferred any ownership interest, despite having testified to some power to do so. So, Parikh advanced substantial sums to Thakkar based on Thakkar's promises to transfer restaurant ownership, thereby partially performing the contract in question. Accordingly, Defendants' reliance on the statute of frauds, even if timely, is misplaced. *Metzgar*, 149 Ga. App. at 404.

2. Defendants further contend that the trial court erred by allowing Parikh's counsel to "inflame the jury" by arguing facts that were not in evidence and asking questions eliciting allegedly irrelevant and inadmissible testimony. More specifically, Defendants argue that the trial court violated its obligation under OCGA § 9–10–185 to stop Parikh's counsel from engaging in this behavior. The record, however, belies this contention.

Here, Parikh thoroughly cross-examined Thakkar regarding his significant history of litigating business debts and attorney fees. The contemplated introduction of this evidence was referenced in the "Plaintiff's contentions" portion of the pre-trial order approved and entered by the trial court, and the trial court ultimately determined that the evidence was admissible and relevant – both as OCGA § 24-4-404 (b) evidence and as evidence relating to the claim for punitive damages.[10] After consideration, the trial court found that the evidence regarding Thakkar's previously

---

[10] OCGA § 24-4-404 (b) provides, in relevant part:

Evidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

litigated business debts would be admissible at trial for the purpose of proving

Thakkar's fraudulent intent. The trial court indicated:

> [This] court found the evidence relevant to the plaintiff's claims against the defendant as stated in the pretrial order: "For years, Thakkar has been accused of and has engaged in a pattern of fraud, deceit, trickery, breaches of contract, breaches of fiduciary duties, and all manner of misfeasance and malfeasance."

The trial court also found this evidence relevant to the issue of punitive

damages, noting: "There was never any effort to have the court bifurcate the trial [in

order to separate consideration of punitive damages], and when the court did bring

that up, the defendant through counsel objected to any bifurcation of the trial. This

evidence was therefore admissible in the first and only stage of the trial."[11]

Defendants now contend that Parikh's counsel used this evidence to inflame

the jury and that the trial court should have stepped in to prevent it pursuant to

OCGA § 9–10–185.

OCGA § 9–10–185 provides:

Where counsel in the hearing of the jury make statements of prejudicial matters which are not in evidence, it is the duty of the court to interpose and prevent the same. On objection made, the court shall also rebuke

---

[11] Defendants raise no enumerations on appeal regarding the non-bifurcation of the issue of punitive damages, and, as such, we do not consider it.

11

counsel and by all needful and proper instructions to the jury endeavor to remove the improper impression from their minds. In its discretion, the court may order a mistrial if the plaintiff's attorney is the offender.

"In ruling on matters contemplated by the above-quoted code section, the trial court is vested with a broad discretion, and its ruling will not be disturbed unless this discretion was manifestly abused." *Urban Med. Hosp. v. Seay*, 179 Ga. App. 874, 876, (348 SE2d 315) (1986).

To support their argument that a violation of OCGA § 9–10–185 occurred, Defendants rely principally on *Sangster v. Dujinski*, 264 Ga. App. 213, 217 (590 SE2d 202) (2003). That case, however, is distinguishable. There, rather than finding certain evidence to be *admissible*, the trial court made a ruling that certain evidence was *inadmissible*, granting the defendant's motion in limine prior to trial. Id. at 214. Despite that ruling, plaintiff's counsel repeatedly made reference to the excluded evidence. Id. On appeal, we concluded that, "[u]nder the extreme circumstances of [that] case," the trial court should have granted a mistrial because plaintiff's counsel referred to forbidden matters throughout opening statements, the trial, and closing arguments. Id. at 217. We explained that "the jury must make th[e] determination [of liability] within the framework of relevant and admissible evidence, not in the context

of persistent attempts on the part of counsel to inject into its deliberations irrelevant and prejudicial matters, including those forbidden by an order in limine." Id. at 218.

Here, however, the trial court found that evidence of Thakkar's past litigated debts was *admissible*. At trial, Parikh argued this admitted evidence to his advantage, as he was allowed to do, and, while Defendants may have suffered from the jury's consideration of this evidence, they chose not to make any attempt to counter it at trial. They cannot now evade the effect of this evidence on the jury by attempting to counter it for the first time on appeal. In any event, Defendants' argument that the trial court committed a violation of OCGA § 9-10-185 is not correct.

Moreover, a review of Defendants' present argument indicates that, rather than actually arguing that Parikh argued *facts not in evidence*, they assert that the evidence of Thakkar's past litigated debts was not *relevant*. For example, Defendants contend:

> None of this had any relevance to the substantive matters before the jury, yet the trial court let it all in, over repeated and strenuous objections from Thakkar's counsel. And, even if there had been evidence of any of this, that evidence would be inadmissible as a matter of law. Without a showing that "other occurrences" were substantially similar to the case at bar, they are irrelevant as a matter of law "and there is nothing upon which the court's discretion can operate." *Forest Cove Apts., LLC v. Wilson*, 333 Ga. App. 731, 736 [(776 SE2d 664)] (2015). (Emphasis omitted.)

13

But this argument is specious. *Forest Cove* is a premises liability case in which we held: "For a prior incident to put a premises owner on notice of a defect, the facts must be sufficiently similar to the facts involved in the present action." Id. at 736. Again, this precedent is distinguishable from the matter at hand, and does not support Defendants' argument premised upon OCGA § 9–10–185.[12]

In addition, the transcript indicates that the trial court did, in fact, interrupt Parikh's cross-examination of Thakkar at one point to admonish the jury that what the lawyers said was not evidence.[13] . So, there is an indication in the transcript, contrary to Defendants' assertion, that the trial court was marshaling Parikh's attorney with appropriate discretion. And, during closing arguments, when Parikh maintained that all of Thakkar's deals ended in litigation, Defendants objected, and the trial court instructed the jury: "It's a portion of argument. [Parikh's counsel is] arguing a

---

[12] A review of the transcript reveals that relevance was also the basis for Defendants' objection at trial. In response to the objection to relevance, Parikh countered: "[T]his is a punitive damages case. This gentleman, for years, is unrepent[a]nt and undeterred. He's been sued over and over and over again and continues to do the exact same things." Defendants then moved for a mistrial, and, thereafter, the trial court found the evidence to be relevant based on the allegations in the pretrial order.

[13] In addition, the trial court instructed the jury on this rule at the beginning of trial.

conclusion that he contends to be drawn from the evidence. Obviously, he doesn't know what exactly is in Mr. Thakkar's mind." The jury, therefore, was fully apprised of the instruction that the mere arguments of Parikh's attorney were not evidence, and Defendants have offered no proof that the jurors did not heed this instruction, as they are presumed to have done.[14] *Ash v. State*, 312 Ga. 771, 781 (2) (865 SE2d 150) (2021) ("[T]he jury is presumed to follow the instructions of the trial court absent clear evidence to the contrary.").

3. Defendants next argue that the $65 million punitive damages award is improper because (a) the underlying fraud claim cannot survive; (b) there is

---

[14] In the midst of this contention, Defendants also take issue with questions directed at Thakkar regarding his affiliation with a disbarred lawyer and his interaction with a witness at trial. With regard to the disbarred lawyer, the trial court found the evidence to be relevant and admissible on the issue of punitive damages, which Defendants chose not to have bifurcated. Defendants fail to address the trial court's reasoning for this ruling. With regard to Thakkar's interaction with a witness, the transcript reveals that Thakkar was seen speaking with a potential accounting witness in the court hallway, and he was asked by Parikh's counsel if he was threatening the witness. Thakkar explained that he was not threatening the witness – only swapping pleasantries. Defendants' counsel requested that the trial court conduct an "inquiry" into this interaction. Parikh's attorney then indicated that he would call the witness to testify, but ultimately chose not to do so, and the trial court observed that, if Defendants wished to place any testimony regarding the interaction with the witness into evidence, they could call her to the stand. Defendants raised no objection to this procedure, and, of course, Defendants chose not to present any evidence at all.

insufficient evidence of punitive conduct; (c) there is no basis for avoiding the

$250,000 cap on punitive damages; and (d) the award violates the federal and state

constitutions.[15] As more fully discussed below, we agree that the punitive damages

award was grossly excessive under the Due Process Clause of the Fourteenth

Amendment.

(a) Defendants begin by reaffirming their arguments that the evidence was

insufficient to support the jury's verdict that Parikh was defrauded. For the reasons

set forth in Division 1, this contention holds no merit.

(b) Defendants next contend that there is insufficient evidence to support a

finding that they acted in any way that would trigger the imposition of punitive

damages. We have previously explained:

---

[15] As recognized by our Supreme Court, OCGA § 51-12-5.1 (d) "requires a bifurcation of the punitive damages issues: the trier of fact first decides whether to award punitive damages and then reconvenes to decide the amount to be awarded." *Webster v. Boyett*, 269 Ga. 191, 192-193 (1) (496 SE2d 459) (1998). Here, however, Defendants explicitly objected to the bifurcation of any part of the punitive damages consideration from consideration of liability for the underlying fraud. As such, many of the evidentiary issues Defendants now attempt to decry on appeal were brought about by their own action, and, on appeal, they cannot rely on errors they created as a reason for reversal. See *Cherokee Nat. Life Ins. Co. v. Eason*, 276 Ga. App. 183, 187 (2) (622 SE2d 883) (2005) (self-induced error furnishes no ground for reversal).

> Under OCGA § 51-12-5.1 (b), punitive damages may be awarded only where it is established by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences. That Code section further limits punitive damages to a maximum of $250,000 for any tort action, unless the trier of fact finds that the defendant acted, or failed to act, with the specific intent to cause harm.

*Quay v. Heritage Financial*, 274 Ga. App. 358, 360 (1) (617 SE2d 618) (2005) (citation and punctuation omitted). See OCGA § 51-12-5.1 (b), (f), (g).

Here, the jury heard testimony that Thakkar promised to transfer ownership in the restaurants to Parikh in return for the promissory notes. They also heard testimony from Thakkar that, although he had the power to transfer property to Parikh, he simply chose not to do so in contravention of an earlier agreement. Exacerbating the nature of this behavior by Thakkar, the jury heard evidence showing that Thakkar had a checkered history of litigation involving unpaid debts, which Parikh used to argue that Thakkar had a repeated "business method" of procuring loans, not paying them back, and letting the consequences play out in subsequent litigation. In addition, there was some evidence that, when Parikh invested money for the operation of the restaurants, Thakkar withdrew this money from the restaurant account and placed it in a separate fund for another business of his own. This evidence

17

supports a jury determination that Thakkar purposefully took funds from Parikh with an intent to neither repay them nor transfer property. So, contrary to Defendants' characterization of the trial transcript (which they argue in the light most favorable to their own interests), at least some evidence supports the jury's determination that they were subject to an award of punitive damages. See, e. g., *Galt Automotive Properties, LLC v. Advesco, LLC*, 357 Ga. App. 304, 304 (1) (850 SE2d 759) (2020) ("Following a jury trial, we view the evidence in the light most favorable to the verdict.") (citation omitted).

(c) In a very similar manner, Defendants contend that the trial court erred in its determination that the $250,000 cap on punitive damages is not applicable in this case. Specifically, Defendants argue that there is no evidence of any specific intent to cause harm to Parikh. But again, the jury found that Defendants acted with specific intent to cause harm, and there was evidence produced at trial (and discussed in the prior paragraph) upon which the jury could have reached this conclusion. This argument fails. *Galt Automotive Properties*, 357 Ga. App. at 304 (1).

(d) Finally, Defendants maintain that the punitive damages award violates the the Due Process Clause of the Fourteenth Amendment of the United States

Constitution as well as Georgia law. For the reasons set forth below, we agree that the "grossly excessive" award violates federal due process.

It is settled that "[p]unitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition," and, "[o]nly when an award can fairly be categorized as 'grossly excessive' in relation to these interests[,] does it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment." *BMW of North America v. Gore*, 517 U. S. 559, 568 (II) (116 SCt 1589, 134 LE2d 809) (1996). When considering a jury's punitive damages award for gross excessiveness under the Due Process Clause, an appellate court must conduct a de novo review and consider three guideposts on appeal:

> (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

*State Farm Mut. Automobile Ins. Co. v. Campbell*, 538 U. S. 408, 418 (II) (123 SCt 1513, 155 LE2d 585) (2003). See also *Cooper Indus. v. Leatherman Tool Group*, 532 U. S. 424,

436 (II) (121 SCt 1678, 149 LE2d 674) (2001). We will consider each of these guideposts in turn.

(i) *Reprehensibility*. "The most important indicium of the reasonableness of a punitive damage award [is] the degree of reprehensibility of the defendant's conduct[.]" *Craig v. Holsey*, 264 Ga. App. 344, 348 (5) (a) (590 SE2d 742) (2003); *BMW of North America*, 517 U. S. at 575 (III) n. 23 ("The flagrancy of the misconduct is thought to be the primary consideration in determining the amount of punitive damages.") (citation and punctuation omitted). Furthermore, in order to evaluate the reprehensibility of a defendant's conduct, an appellate court must consider whether

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*State Farm Mut. Automobile Ins. Co.*, 538 U. S. at 419 (III) (A).

Applying these factors here, Thakkar's conduct (though the act of fraud, itself, is certainly reprehensible) does not appear to be *so* reprehensible that it deserves to be punished by an award of $65 million. Thakkar's conduct resulted in economic, not physical, harm that was suffered solely by Parikh in this case; the conduct did not

disregard the physical health or safety of others; and Parikh, a cardiologist and investor, was not shown to be a target with any particular financial vulnerability. Furthermore, although Thakkar was shown to have a history of litigating debts, there was no particular showing that all of these suits were premised on repeated actions of fraud or fraudulent inducement. On the other hand, Thakkar's commission of fraud in the present case *was* found to entail an element of intentional deceit. Balancing everything, Thakkar's actions trigger, at best, a small minority of the reprehensibility factors, and, as such, this guidepost would not appear to fully support the massive punitive damages award given to Parikh.

(ii) *Ratio.* "The second guidepost is the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award." *Craig*, 264 Ga. App. at 349 (5) (b) (emphasis omitted). When considering the ratio of compensatory to punitive damages, "[w]e need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case. We can say, however, that a general concern of reasonableness properly enters into the constitutional calculus." *BMW of North America*, 517 U. S. at 582-583 (III) (citations and punctuation omitted).

"It is not enough, as some have suggested, 'to do the math'; we must also do the reasoning." *Time Warner Entertainment Co. v. Six Flags Over Ga.*, 254 Ga. App. 598, 607 (3) (b) (ii) (563 SE2d 178) (2002). "The punitive damages award must be viewed in its unique context, in light of the facts of the case and with reference to the actual damages awarded and the potential harm that could have resulted from the defendant's conduct." Id. at 606 (3) (b) (ii) n. 9. However, "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm Mut. Automobile Ins. Co.*, 538 U. S. at 425 (III) (B).[16]

In this case, with specific reference to the claim of fraud, the jury awarded Parikh $650,000 in compensatory damages and $65,000,000 in punitive damages – a ratio of 1:100. This far exceeds a single digit ratio, and, as such, makes it highly questionable that the award satisfies due process. *State Farm Mut. Automobile Ins. Co.*, 538 U. S. at 425 (III) (B). Considering this case in its unique context, the act to be

---

[16] We note that this is not a case involving minimal compensatory or nominal damages, and there is no concern that some limitation of the amount of punitive damages might hinder the deterrent and punitive purposes of a such an award. See *Bearoff v. Craton*, 350 Ga. App. 826, 845 (7) n. 21 (830 SE2d 362) (2019).

punished is Thakkar's fraudulent inducement of Parikh – one businessman defrauding another. The potential and actual harm flowing from this fraudulent act was to one individual, that harm was only economic in nature, and the jury remedied that harm by imposing a significant amount of compensatory damages. Under these specific circumstances, the ratio guidepost cuts strongly against a punitive damages award of $65 million.[17]

At this point, then, the $65 million award of punitive damages largely fails the first two guideposts.

---

[17] As the United States Court of Appeals for the Eleventh Circuit has explained:

> Moreover, the [United States Supreme] Court has noted that few awards exceeding a single-digit ratio, to a significant degree, will satisfy due process. Nevertheless, when a particularly egregious act has resulted in only a small amount of compensatory damages, then a greater ratio may be sustainable. Conversely, when the plaintiff has received a substantial compensatory damages award, then a lesser ratio—perhaps just a 1:1 ratio (that is, total damages not exceeding double the compensatory damages award)—will reach the outermost limit of the due process guarantee.

*Williams v. First Advantage LNS Screening Solutions*, 947 F3d 735, 750 (IV) (A) (11th Cir. 2020) (reducing a 13:1 award). Compare *Fassnacht v. Moler*, 358 Ga. App. 463, 476-480 (3) (a) (855 SE2d 692) (2021) (son's conduct against father exhibited a high degree of reprehensibility, as would support determination that punitive damages award was not grossly excessive in violation of due process).

(iii) *Sanctions for Comparable Misconduct.* "Comparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides a third [guidepost] of excessiveness." *BMW of North America*, 517 U. S. at 583 (III). Here, the civil and criminal penalties for fraud are *far less* than the $65 million award of punitive damages. For example, credit card fraud is punishable by 1-3 years in prison, and the monetary fine is capped at $5,000. See OCGA § 16-9-38.

Therefore, taking the three guideposts together (and giving appropriate emphasis to reprehensibility), the jury's award of $65 million in punitive damages appears to be grossly excessive, especially given the insular nature of the specific act being punished in this case.[18] Accordingly, we conclude that, under the peculiar

---

[18] While not a guidepost, we must also question Parikh's argument to the jury regarding the reason that they should impose a massive punitive damages award. Specifically, Parikh argued that an extremely large award was necessary to generate news publicity. Indeed, Parikh encouraged the jury to award $1 billion. Parikh reasoned that such an exorbitant award, in effect, would send a warning to the general public that they should not do business with Thakkar. But this argument somewhat misses the point about the purpose of punitive damages – publicity would not necessarily stop or deter Thakkar from attempting to defraud others, as Parikh seems to argue. It might make it somewhat more difficult to find an unsuspecting victim due to publicity, but it would not necessarily discourage the illicit behavior, itself. And, as Parikh admitted to the jury, "I don't think we can change Mr. Thakkar."

circumstances of this matter, the punitive damages award violates the Due Process Clause of the Fourteenth Amendment. As such, we vacate the punitive damages award and remand this case to the trial court for further proceedings in light of this opinion.[19]

4. Finally, Defendants maintain that the award of attorney fees pursuant to OCGA § 13-6-11 was inappropriate for two reasons: (1) there was no evidence of bad faith to support the award and (2) the statute allows only "expenses of litigation" which should be construed to exclude attorney fees. We disagree.

With regard to the evidence presented at trial,

> attorney fees are recoverable under OCGA § 13-6-11 when a party has acted in bad faith, has been stubbornly litigious, or has subjected the other party to unnecessary trouble and expense. Questions concerning bad faith, stubborn litigiousness, and unnecessary trouble and expense are generally questions for the jury to decide[, and an] award of attorney fees under OCGA § 13–6–11 will be affirmed if there is any evidence to support it.

*City of Lilburn v. Astra Group*, 286 Ga. App. 568, 570 (649 SE2d 813) (2007) (citations and punctuation omitted). Here, contrary to Defendants' interpretation of events,

---

[19] Given the ruling that the punitive damages award violates the Due Process Clause of the United States Constitution, we need not reach the issue of whether is also violates the Georgia Constitution.

there was evidence that Thakkar knew he could transfer ownership interests to Parikh but never had the intention to do so, thereby causing Parikh the expense of filing suit to enforce his agreement with Thakkar. This provides some evidence of bad faith, and, as such, we will uphold the jury's award of attorney fees.

With regard to Defendants' argument that we should construe the language of OCGA § 13-6-11 to exclude the award of attorney fees as part of the "expenses of litigation," over 120 years of precedent belies this contention. See *Traders' Ins. Co. v. Mann*, 118 Ga. 381, 381 385-386 (45 SE 426) (1903) (construing predecessor to OCGA § 13-6-11, describing conduct that could constitute bad faith in an action on an insurance policy, and holding that a mere refusal to pay does not constitute bad faith); *Taylor v. Devereux Foundation, Inc.*, 316 Ga. 44, 89 (VII) (885 SE2d 671) (2023). We see no reason to upend this century of caselaw.

*Judgment affirmed in part, vacated in part, and case remanded with direction. Land, J., concurs. Dillard, P. J., concurs fully in Division 1, 2, 3 (a-c), and 4, and concurs dubitante in Division 3(d).*

A25A0588. THAKKAR v. PARIKH

A25A0589. THAKKER et al v. PARIKH

DILLARD, Presiding Judge, concurring in part and concurring dubitante in part.

I concur fully in Divisions 1, 2, 3 (a)-(c), and 4 of the majority's thoughtful and well-reasoned opinion. But I concur dubitante[1] in Division 3 (d) because I share the views expressed by Justice Scalia in his dissent to *BMW of North America, Inc. v. Gore*.[2] In a nutshell, I agree with Justice Scalia that the *BMW* majority's ill-founded decision to wade into an extratextual policy question amounted to an "unjustified incursion into the province of state governments."[3] More precisely, Justice Scalia expressed the view that "a *state* trial procedure that commits the decision whether to impose punitive damages, and the amount, to the discretion of the jury, subject to some

---

[1] A concurrence dubitante is a concurrence given doubtfully. Unlike a concurrence in the judgment only or a special concurrence without a statement of agreement with all that is said, a concurrence dubitante is a full concurrence, albeit one with reservations. *See Benefield v. Tominich*, 308 Ga. App. 605, 611 n.28 (708 SE2d 563) (2011) (Blackwell, J., concurring dubitante); *Brumbelow v. Mathenia*, 358 Ga. App. 404, 404-05 (855 SE2d 425) (2021) (Dillard, P. J., concurring dubitante). *See generally* Jason J. Czarnezki, *The Dubitante Opinion*, 39 AKRON L. REV. 1 (2006).

[2] 517 U.S. 559, 598-607 (116 SCt 1589, 134 LE2d 809) (1996) (Scalia, J., dissenting).

[3] *Id*. at 598.

judicial review for reasonableness, furnishes a defendant with all the process that is due."[4] And like Justice Scalia, I also "do not regard the Fourteenth Amendment's Due Process Clause as a secret repository of substantive guarantees against unfairness—neither the unfairness of an excessive civil compensatory award, nor the unfairness of an unreasonable punitive award."[5] To the contrary, what the Fourteenth Amendment's[6] "procedural guarantee assures is an opportunity to contest the

---

[4] *Id.* (punctuation omitted) (emphasis supplied); *see also TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 470 (113 SCt 2711, 125 LE2d 366) (1993) (Scalia, J., concurring in judgment); *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 25-28 (111 SCt 1032, 113 LE2d 1) (1991) (Scalia, J., concurring in judgment).

[5] 517 U.S. at 598-99 (punctuation omitted); *see State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 429 (2003) (Scalia, J., dissenting) ("[T]he punitive damages jurisprudence which has sprung forth from BMW v. Gore is insusceptible of principled application; accordingly, I do not feel justified in giving the case stare decisis effect."); *see also Albright v. Oliver*, 510 U.S. 266, 275 (114 SCt 807, 127 LEd 2d 114) (1994) (Scalia, J., concurring) ("I reject the proposition that the Due Process Clause guarantees certain (unspecified) liberties, rather than merely guarantees certain procedures as a prerequisite to deprivation of liberty."); *McDonald v. Chicago*, 561 U.S. 742, 791 (130 SCt 3020, 177 LEd2d 894) (2010) (Scalia, J., concurring) (in which he refers to his "misgivings about Substantive Due Process"); Robert H. Bork, *The Tempting of America: The Political Seduction of the Law* (New York: Touchstone, 1990) p. 31 (noting that the "transformation of the due process clause from a procedural to a substantive requirement was an obvious sham"); John Hart Ely, Democracy and Distrust 18 (1980) (in which he aptly notes that "substantive due process" is a "contradiction in terms," like "green pastel redness.").

[6] *See* U.S. Const. amend. XIV, Sec. I. (" . . . No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States;

reasonableness of a damages judgment in *state* court; but there is no federal guarantee a damages award actually be reasonable."[7] And while these views have not yet prevailed at the Supreme Court of the United States, I still feel compelled to cast my lot with Justice Scalia in the hope that one day *BMW* will be swept into the dustbin of jurisprudential history—where it rightly belongs.

---

nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."); Ga. Const. Art. I, Sec. I, Par. I ("No person shall be deprived of life, liberty, or property except by due process of law.").

[7] 517 U.S. at 599 (emphasis omitted and supplied); *see Fed. Ins. Co. v. Perlmutter*, 376 So3d 24, 39 (Fla. Dist. Ct. App. 2023) (Artau, J., concurring) (citing Justice Scalia's dissent in *BMW* and noting that "the original understanding of the Fourteenth Amendment did not include protection from a punitive or exemplary damages claim"); Jeremy C. Baron, *The "Monstrous Heresy" of Punitive Damages: A Comparison to the Death Penalty and Suggestions for Reform*, 159 U. PA. L. REV. 853, 866 (II) (2011) (characterizing Justice Scalia's dissent in *BMW* as expressing as "unprincipled the idea that the Fourteenth Amendment has any bearing on the extent to which a state can impose punitive damages"); Daniel R. LeCours, *Steering Clear of the "Road to Nowhere": Why the BMW Guideposts Should Not Be Used to Review Statutory Penalty Awards*, 63 RUTGERS L. REV. 327, 358 (III) n.63 (2010) ("Dissenting in *BMW*, Justice Scalia aptly pointed out that the line of punitive damage cases leading up to *BMW* relied entirely on *Lochner*-era cases involving the review of statutory penalties." (italics supplied)); *see also* Amy Coney Barrett, *Originalism and Stare Decisis*, 92 Notre Dame L. Rev. 1921, 1932–33 (2017) (noting that Justice Scalia "consistently declined to apply the cases holding that the Due Process Clause imposes a "fairness" cap on punitive damages).